UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Robert Valentine,                          :    Case No. 1:10-cv-922
                                           :
      Plaintiff,                      :
                                           :
vs.                                        :
                                           :
Remke Markets, Inc.,                       :
                                           :
      Defendant.                      :

## ORDER

Before the Court is Defendant's motion for summary judgment.  (Doc. 25)

Plaintiff opposes the motion (Doc. 33), and Defendant has filed a reply brief.  (Doc. 35)

Plaintiff alleges that Defendant discriminated against him on the basis of his race and

age when it did not offer him employment.  He also alleges that Defendant refused to

hire him because of a racial discrimination complaint and EEOC charge he filed against

his former employer. For the following reasons, the Court will deny Defendant's motion.

## FACTUAL BACKGROUND

Robert Valentine is a pharmacist who, from 2008 until 2010, worked for Bigg's, a

retail supermarket and pharmacy; Bigg's was owned by another company called

Supervalu.  Valentine has over 40 years of experience as a pharmacist,  and he was

appointed by the Governor of Ohio to serve two terms on the Ohio State Board of

Pharmacy.  He has also been involved in many civic and charitable activities.  Valentine

is an African-American, and he was 75 years old in 2010 when the events giving rise to

this lawsuit occurred. Valentine worked for Bigg's at its Highland Ridge store as a Staff Pharmacist. Deborah Wirth-Barnes was the Pharmacy Manager at the Highland Ridge store.

Valentine filed an EEOC claim against Bigg's in April 2009. (Valentine Dep. Ex. F) He complained to his district supervisor that Mark Landman, who was then his pharmacy manager at Highland Ridge, harassed and discriminated against him due to his race and his age, after Valentine had complained about poor handling of controlled substances in the pharmacy. Valentine also notified the Ohio Board of Pharmacy about discrepancies in the inventory of narcotic drugs. He told the Board that he refused to fill what he described as suspicious prescriptions for narcotics; when those customers complained, Landman told them to lodge complaints against Valentine with Bigg's district manager. After his report to the Board, Valentine alleged that Landman and the district manager harassed him and made false accusations against him. Valentine testified that his EEOC claim was resolved when Bigg's took steps to remedy the problems, and Landman was transferred to a different Bigg's store. Wirth-Barnes began as a pharmacy manager at Highland Ridge in May 2009 after Landman was transferred. (Wirth-Barnes Dep. at 16-17)

Defendant Remke Markets, Inc., a local supermarket/pharmacy business, purchased eight of the Cincinnati-area Bigg's stores and their in-store pharmacies from Supervalu in early 2010, including the Highland Ridge store. Remke's Pharmacy Director, Christe Reynolds, was in charge of hiring staff for the former Bigg's pharmacies that Remke bought. Remke decided to limit applications for these positions to current Bigg's pharmacy employees. Reynolds testified that the most important

criteria she used in deciding whether to hire an individual were (1) openness to the idea of new management, (2) being passionate about all aspects of the job, (3) passion for Remke customers and an ability to engage in their relationship with customers, and (4) strong pharmacy skills.  (Reynolds Dep. at 27-28)  When asked if she had a preference for keeping current Bigg's pharmacy employees at their stores, she responded:

> If it was working out for them and that team was being successful, and I would base that success on the feedback of each other of how successful the work environment was, I would lean more to keeping them in that preference, if they had been at that location for a significant amount of time. And the reason that is is because of the relationships with the guests. [sic]  They had built a relationship with their guests, then that is obviously important for pharmacy because you have to trust your pharmacist.

(Id. at 52)

Valentine applied for a Staff Pharmacist position with Remke, as did Wirth-Barnes and many other Bigg's pharmacy employees.  Reynolds scheduled 15-minute interviews with each Bigg's applicant, and said that her interview was her primary vehicle to assess an applicant's skills.  She testified that she wanted to have another Remke employee join her for each interview.  When she interviewed Valentine, she was joined by Mark Sanders, a Remke store manager.  Reynolds admitted that Valentine's was one of only two interviews in which another Remke employee joined Reynolds,  and the rest were conducted solely by Reynolds.  (Doc. 33, Ex. 2, Remke's Interrogatory Responses; Reynolds Dep. at 144-145)   Reynolds explained that scheduling issues did not permit two Remke employees to conduct every interview.

Reynolds completed an "Interview Rating Scale" form for each applicant she interviewed.  This form included a list of eleven characteristics with a numerical ranking

for each, with 1 being "Excellent" and 5 being "Unsatisfactory."  Reynolds gave

Valentine a 2 for "related job experience," for "dependability/reliability," for "interest in

job and company," and "availability."  She rated him at 3 for "maturity/composure,"

written skills, and for planning and organizing skills; and rated him at "4" for "people

skills (interpersonal skills)," "personality (appropriate for considered job?)," oral skills,

and "initiative/willingness to learn."  (Reynolds Dep. Ex. 10)  Reynolds also made notes

on the form for many of the interviewees.  She wrote on Valentine's form that Valentine:

> - was not engaging

> - standoffish

> - definitely has a heart for the elderly, my concern does he have a heart
> for all customers

> - does not seem interested in doing things differently than always have
> [sic].

Reynolds described her interview with Valentine and identified the factors that led

to her decision not to offer him a job with Remke.  She felt that "... he had a heart for a

significant group of people that he waited on.  But I didn't trust that he was going to be

able to follow direction or amend to new rules.  He seemed very set in his ways and that

he knew the right way to do things and there would be nothing other than that.  So in

that way, ... I didn't feel he was trustworthy in the business end of it."  (Reynolds Dep. at

55)  She said that Valentine was "very unengaging.  He seemed to not care why I was

there, disinterested, had better things to do, sense of entitlement."  (Id. at 55-56) She

described him as physically turned away from her and the other interviewer, and that he

had "an air of entitlement to him."  (Id. at 124-125)  She explained that Valentine

actually turned and looked away from her during the interview, and the only time he

faced her was when he answered a question.  Reynolds described herself as a "hands on" manager, and she wanted to hire pharmacists who would accept that style of management.  She thought that Valentine would be "difficult to manage," but she could not recall anything that he said that gave her that impression, "I just recall that emotion." (Id. at 132)  She admitted that Valentine was dressed professionally, and did not say anything inappropriate during the interview.  (Id. at 131)  She agreed that Valentine was objectively qualified for the position, but believed that "he didn't have the characteristics required or personal skills and customer service oriented during that interview process that led me to believe he was Remke qualified [sic]."  (Id. at 142-143)

When asked about her handwritten comment that Valentine had a "heart for the elderly," she recalled that he volunteered during the interview that he was "doing things on his own time to engage with the community and the elderly. ... He was very passionate about that ... [p]assionate to the extent he just kept repeating it."  (Id. at 156) Reynolds said she "was just really disappointed with his interview.  And then looking further at his application and resume, realizing he hadn't even updated his resume.  And that also seemed to imply that he didn't seem to want to put the effort forth, that he thought he should be entitled to the position."  (Id. at 125)  Reynolds admitted that Valentine's application and resume were not discussed during the interview.  (Id. at 149-150)

Valentine was the only African American applying for a staff pharmacist position with Remke.  Reynolds ultimately decided to fill the staff pharmacist position at the Highland Ridge store with another Remke pharmacist, Dave Orth, who is Caucasian and was 42 years old at the time.  The Highland Ridge store was the only Bigg's store

bought by Remke where Reynolds filled the staff pharmacist position with a non-Bigg's employee.  (Id. at 143)

Valentine testified that he relied on Wirth-Barnes, his pharmacy manager, to inform him about the process for applying at Remke, and he recalled there was a "lot of confusion" around the transition process.  (Valentine Dep. at 37)  Wirth-Barnes wanted to continue working with Valentine after the transition, and they planned to tell Remke during their respective interviews about the opportunities for expansion in the community that the Highland Ridge store served.  Valentine admitted that "we all assumed that things would continue" with Remke, and that he did not believe he would need to compete for a job; he believed "it was a foregone conclusion that I would be continuing there and, you know, I didn't theorize."  (Id. at 39)  Valentine wanted to work for Remke, and to continue working with Wirth-Barnes to improve services to their community.  Other than talking to Wirth-Barnes, he did not do anything else to prepare for his interview; he said he was familiar with Remke because his wife patronized one of their grocery stores, and "they were very kind to her," so he considered it a good sign that they would be taking over the Highland Ridge Bigg's store.  (Id. at 58-59)

Before his interview, Valentine received a telephone call at the store from a pharmacist inquiring about a position.  The individual was not a Remke employee but he asked Valentine when he was leaving, telling Valentine that he had been told that Remke was looking for a pharmacist for Highland Ridge.  Wirth-Barnes also told Valentine that another pharmacist, Dan Kaiser, told Wirth-Barnes that he had been offered the Highland Ridge position but had turned it down.  Valentine recalled that the individual who was eventually hired to fill his position, David Orth, also called Wirth-

Barnes to ask about the job. Valentine said that all of these calls and conversations occurred prior to his interview with Reynolds. He described some "chatter" going on that he would not be hired by Remke but he could not pin down the source of this "chatter," and that Wirth-Barnes "started to get concerned." (Id. at 60-61)

Reynolds interviewed Wirth-Barnes and Valentine on the same day, with Valentine coming after Wirth-Barnes. When Valentine arrived, he was handed an application form to complete; he did not have time to fully complete the form before Reynolds was ready for his interview. He brought a resume with him, but had mistakenly brought an outdated form instead of his current resume. (Id. at 50-51, 55) Valentine wanted to make a good impression on Reynolds, and wanted to convey what he believed could be accomplished in the future at the Highland Ridge store, as he knew that Reynolds was Remke's decision-maker. He said that Reynolds walked over to him while he was filling out the application and introduced herself, asking him "what would you say if I told you some people find you hard to get along with?" (Id. at 70-71) Valentine did not know how to respond to her comment. During the interview, he tried "to sell myself to the group who I am and the vision I hold for the store and what could be done for the community, what could be done in terms of increased business and revenue, what the needs were, that there was a big void ... with respect to senior citizens that was not being met." Valentine said that Reynolds was accompanied by another man and two women, and Reynolds did not ask him any questions. The gentleman commented at one point that Valentine seemed to have a concern for senior citizens; Valentine "tried to turn it into a joke. I said, yeah, because I'm one of them, and we all laughed and shortly after that the interview was over." (Id. at 71) He

recalled that he did most of the talking, and that he did not get an indication from the group "that what I was saying was getting through." (Id. at 76) No one asked Valentine any inappropriate questions or made any comments about race or age that made him uncomfortable. But he felt that something was wrong, and when he returned to the store he talked to Wirth-Barnes about her interview and they compared their experiences. They both believed that, due to the previous telephone calls and his concern about his interview, he might have a problem. Valentine expected that Wirth-Barnes would be hired, however, and she told Valentine not to worry because she would intercede on his behalf and make telephone calls for him.

A few weeks later, Valentine received a phone call from Greg Goodwin, another Bigg's pharmacist who was acting as Reynolds' assistant for the transition. Goodwin told Valentine that his last day of work would be the following Sunday, and telling Valentine "I think it stinks." (Id. at 90) Valentine did not receive any other communication from Remke about its decision not to offer him a position.

Reynolds testified that the only Bigg's employees who gave her opinions about Valentine were Wirth-Barnes and Goodwin. (Reynolds Dep. at 72) Wirth-Barnes was very positive about Valentine, and said she enjoyed working with him. She had completed Valentine's evaluation for Bigg's in March 2010, and gave him an overall performance rating of 4 out of 5 (with 5 being the highest rating). She wrote that "[i]t is a pleasure to work with Bob. As a colleague we have many similar ethics and ideas. This is very important in having a smooth running pharmacy." She also stated that "Bob has very high expectations of himself and does do very well communicating with team members and patients." (Wirth-Barnes Dep. Ex. 1) Wirth-Barnes testified that she had

two telephone calls with Reynolds during the transition. In both conversations she recommended that Reynolds hire Valentine, and that in her opinion, Reynolds "would be doing a disservice to Remke and a disservice to the community if Mr. Valentine wasn't hired." (Wirth-Barnes Dep. at 59)

Reynolds recalled that Wirth-Barnes called her once after the interviews. Reynolds said she "... seemed fearful ... that she was afraid that we would lose our technicians at the location if Mr. Valentine did not stay employed with us and that she would be left by herself in a transitional store with customers." Wirth-Barnes told Reynolds that Valentine was a good pharmacist and repeated the positive statements about Valentine that she gave during her own interview with Reynolds. (Reynolds Dep. at 76-77) But Reynolds concluded that Wirth-Barnes was simply fearful of losing Valentine, which she believed was not "positive." (Id. at 77-78)

Reynolds testified that Goodwin told her that Valentine had some "... interaction with Bigg's, legal action and with his coworkers, possibly. But he didn't go into detail and I didn't ask. He also stated that, and it was all secondhand knowledge at that point, but the majority of the [customer] complaints that came out of that store were about Mr. Valentine." (Reynolds Dep. at 101-102) Reynolds testified that Goodwin's input played no role in her decision not to hire Valentine.

Greg Goodwin started working for Bigg's in September 2009 as a pharmacist, and he remained with Remke after the transition until he was terminated in August 2010. Goodwin attended pharmacy school with Reynolds. Goodwin testified that Mark Landman told him about Valentine's prior discrimination complaints and EEOC claim sometime during the Remke transition, telling Goodwin that the claim involved alleged

racial discrimination against Landman and a pharmacy intern.  Goodwin said that he did not tell Reynolds about Landman's comments; he believed that a Bigg's manager, Steve McCann, told Reynolds about Valentine's claim.  Goodwin said that Chris Basler (who was Goodwin's Bigg's/Supervalu district manager) told Goodwin that he and McCann had discussed the Bigg's pharmacists with Reynolds.  Basler, McCann and Reynolds had visited each of the Cincinnati Bigg's stores very shortly after the announcement of the Remke buyout, in order to "soften the blow a little bit."  (Goodwin Dep. at 64-65)  According to Goodwin, Reynolds told Goodwin that she learned about Valentine's claim during her conversations with McCann and/or Basler.  Goodwin said that Reynolds seemed "indifferent" to the fact that he had filed a claim, but that she brought it up in the context of not offering Valentine a job, as it was a "... factor to consider in how to handle it.  Meaning that if [Valentine] maybe would be sensitive to not being made the offer because of previous conditions or whatever [sic]."  (Goodwin Dep. at 65-66)   Goodwin also recalled Reynolds telling him that she had another Remke employee join her for Valentine's interview because of his previous claim against Bigg's.  (Id. at 152)   Goodwin did not recall telling Reynolds about any customer complaints involving Valentine, and said he could not understand in what capacity he would have received such complaints, as he was a manager at a different store in a different part of Cincinnati.  (Id. at 179-180)

Valentine filed his complaint in this case on December 22, 2010 (Doc. 1), alleging claims for race and age discrimination and retaliation under federal and state law.

**ANALYSIS**

Summary Judgment Standards

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An assertion of a undisputed fact must be supported by citations to particular parts of the record, including depositions, affidavits, admissions, and interrogatory answers. The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal quotation omitted). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250. "If the evidence is merely colorable, ... or is not significantly probative, ... the court may grant judgment." Anderson, 477 U.S. at 249-50 (citations omitted).

The court construes the evidence and draws all reasonable inferences in favor of the non-moving party. Martin v. Cincinnati Gas & Elec. Co., 561 F.3d 439, 443 (6th Cir. 2009).

Race and Age Discrimination

Valentine has no direct evidence of race or age discrimination, and relies on indirect evidence. Under the familiar McDonnell-Douglas analytic framework, a prima facie case of race discrimination requires Valentine to show that (1) he is a member of a protected class, (2) he was qualified for the position, (3) he was rejected despite his qualifications, and (4) the position was filled by someone outside of his protected class. Similarly, a prima facie case of discrimination under the Age Discrimination and Employment Act ("ADEA") requires him to show (1) he was at least 40 years old when he applied, (2) he was qualified for the position, (3) he was rejected for that position, and (4) a substantially younger person was hired for the job. Geiger v. Tower Automotive, 579 F.3d 614, 622 (6th Cir. 2009). The same standards apply to Valentine's analogous state law discrimination claims.

Remke concedes for purposes of Valentine's motion that he has established his prima facie case on race and age discrimination. Remke contends that it has offered a legitimate non-discriminatory reason for the decision not to hire Valentine, his exceedingly poor interview with Reynolds. Valentine must then show that this reason is a pretext for unlawful discrimination. He may do so by demonstrating that (1) Remke's stated reason has no basis in fact, (2) the reason given is not the actual reason for the hiring decision, or (3) the reason is insufficient to explain Remke's action. See Imwalle v. Reliance Med. Products, Inc., 515 F.3d 531, 545 (6th Cir. 2008), citing Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir. 1994). The Sixth Circuit has made it clear, however, that it has "... never regarded those categories as anything more than a convenient way of marshaling evidence and focusing it on the

ultimate inquiry: 'did the employer fire the employee for the stated reason or not?' "

Tingle v. Arbors at Hilliard, ___ F.3d ___, 2012 U.S. App. LEXIS 18315 (6th Cir., August 29, 2012). It is Valentine's burden to produce "sufficient evidence from which the jury could reasonably reject [Remke's] explanation and infer that [Remke] intentionally discriminated against him." Johnson v. Kroger Co., 319 F.3d 858, 866 (6th Cir. 2003).

Remke argues that Valentine cannot show that its proffered reason was factually false: Reynolds personally conducted Valentine's interview, observed his conduct, and she articulated specific facts for her decision not to hire Valentine. Remke contends that Valentine has no evidence that Reynolds did not "honestly believe" her assessment of Valentine. It further argues there is no evidence that the actual reason for its decision was discrimination, because 7 out of 14 of the individuals that were hired as staff pharmacists were over the age of 50, and one was in his 60's, belying any age-based animus. While Remke concedes that Valentine was the only African-American applicant of the group, it also hired another racial minority applicant, Suha Umina. And Remke argues that Valentine has not established that Remke's reason for its decision was insufficient to motivate that decision, as Reynolds rejected two younger Caucasian candidates (Gildea and Sands) after their interviews.

The Sixth Circuit has explained that

> ... the key inquiry in assessing whether an employer holds ... an honest belief is whether the employer made a reasonably informed and considered decision before taking the complained-of action. An employer has an honest belief in its rationale when it reasonably relied on the particularized facts that were before it at the time the decision was made. We do not require that the decisional process used by the employer

be optimal or that it left no stone unturned.

Allen v. Highlands Hosp. Corp., 545 F.3d 387, 398 (6th Cir. 2008), quoting Michael v.

Caterpillar Fin. Servs. Corp., 496 F.3d 584, 598-99 (6th Cir. 2007).  In Allen, the plaintiff

Allen's granddaughter had been seen at the hospital where Allen worked.  Allen's

daughter forgot to pick up the child's xrays, which were needed for a doctor's

appointment.  Allen's daughter asked Allen to pick up the films for her, but Allen was told

by the radiology department that she could not get the films without her daughter's

signed release.  Plaintiff Slone worked in the radiology department as a transcriptionist;

Allen asked Slone to get the xrays for her.  Allen later signed her daughter's name on an

authorization form and backdated it.  Both Allen and Slone were fired for violating patient

privacy policies.  There was no evidence of a written hospital policy detailing the

requirements for authorizations for the release of records, and the hospital's vice

president admitted that a verbal authorization might be allowed in an emergency.  Allen

argued that her daughter gave her verbal permission to obtain the x-ray, and had

specifically asked her to do so.  Nevertheless, the Sixth Circuit affirmed the summary

judgment granted to the hospital, finding that the employer held an honest belief that

both plaintiffs violated the policy against unauthorized release of information:

> Despite the lack of a written policy ..., the uncontradicted
> evidence shows that the Hospital engaged in a thorough
> investigation to determine whether [the employees'] conduct
> was inappropriate.  This investigation was conducted by
> personnel in the Human Resources Department ... and
> included interviews with [both employees], in addition to a
> number of employees and supervisors within the radiology
> department.  All of the management officials involved in the
> investigation agreed that Allen and Slone had committed a
> Group I offense and recommended that they both be
> terminated.  The response by the plaintiffs failed to produce

> any evidence indicating that the process the Hospital used to conduct the investigation was irregular or idiosyncratic. ... To the contrary, the record here shows that the Hospital 'reasonably relied on the particularized facts that were before it' in deciding to terminate Allen and Slone."

Id. at 398.

And in Michael v. Caterpillar Fin. Servs., the plaintiff was disciplined after an altercation with a supervisor; the employer had also received complaints about Michael's management skills a few days before the altercation. Human resources personnel investigated the altercation; another employee who witnessed it said that Michael stood and screamed at her supervisor after she calmly asked Michael to leave her office. Interviews with all of Michael's subordinates yielded many complaints about Michael's management style, and one employee reported that she was ready to quit the company because of Michael's conduct. The investigator met with Michael, who denied her supervisor's account and claimed that the supervisor discriminated against her. Michael was placed on a performance plan (which she successfully completed), but alleged that the imposition of both that plan and a one-week involuntary administrative leave were discriminatory. The Sixth Circuit held that Michael's disagreement with facts uncovered during the employer's investigation did not create a genuine factual dispute as to whether her employer held an honest belief in its reason for imposing the discipline. The employer's interviews with other employees documented their descriptions of Michael's management problems, and an independent witness reported on the altercation between Michael and her supervisor.

A similar result was reached in Majewski v. Automatic Data Processing, Inc., 274 F.3d 1106 (6th Cir. 2001), affirming judgment for the employer in plaintiff's age

discrimination case.  Plaintiff had complained about his supervisor's evaluation, accusing the supervisor of singling him out for unfair criticism.  His employer assigned an HR representative to investigate his charges, and many of plaintiff's fellow employees confirmed the supervisor's evaluation, reporting that plaintiff made errors and caused problems in the department.  The investigator found that the supervisor's evaluations and his attempts to help plaintiff improve his performance were appropriate.  After further performance problems, plaintiff was terminated.  The court found that the evidence supported the employer's claim that it honestly believed that plaintiff had serious performance problems, citing the employer's documentation of his declining performance and the company's investment in a performance plan designed to help him improve. Plaintiff's bare denial of his problems did not suffice to call into question the employer's honest belief that the problems existed, and were serious enough to warrant his termination.

Remke relies on Seeger v. Cincinnati Bell Tel. Co., 681 F.3d 274 (6th Cir. 2012), holding that plaintiff failed to rebut his employer's honest belief in the reasons it gave for terminating him.  Plaintiff, a long-term employee, had been approved for paid disability leave from his job after developing a herniated disc.  One requirement of the disability plan was that the employee was required to work in a modified or light-duty position if medically able to do so.  About a month into his leave, he reported to his physician that he was still in significant pain and had trouble walking; the physician then reported to his employer that he could not yet perform any sort of restricted or light duty work.  Four days after this report from his doctor, plaintiff was seen by several co-workers at a local street festival, where he walked a total of ten city blocks and consumed one or two

beers.  One of the employees reported the incident, and the employer conducted an investigation.  This included obtaining statements from plaintiff's co-workers, additional statements from the plaintiff and records from his doctor, and a review of plaintiff's records by the employer's rehabilitation nurse manager.  After that investigation, plaintiff was terminated for committing disability fraud.  The district court granted summary judgment to his employer on plaintiff's FMLA discrimination claim, and the Sixth Circuit affirmed.  The court noted that the employer never denied plaintiff's documented medical problem.  But plaintiff did not dispute that four days after he reported significant disabling pain, he went to the street festival and his co-employees reported that he was able to walk and drink a beer or two.  These were particularized facts that "understandably raised a red flag" for the employer.  Id. at 287.  The employer's investigation was thorough, and it was immaterial whether or not the employer or the court might have reached a different conclusion on the same facts.

Here, Remke relies entirely on Reynolds' perceptions of Valentine during the 15-minute interview to explain its decision.  These perceptions - that he was "standoffish" and "not engaging" or that he had poor "people skills" and a poor "personality" for the job - are subjective.  Remke suggests that Valentine is merely complaining that its hiring process was imperfect.  It notes that Reynolds had only a short time in which to complete the hiring for the Remke stores, which did not allow her to do an "exhaustive investigation and evaluation of every aspect of each individual applicant ...".  (Doc. 25 at 12)  The Court does not understand Valentine to be attacking Remke's hiring process per se.  While Valentine believed that his 15-minute interview was too short to present all of his thoughts, there is no evidence that there is something inherently pretextual about

15-minute interviews.  Nor do his claims involve an attack on Remke's process of gathering information about applicants, or an internal investigation that Reynolds conducted about Valentine, because Reynolds admitted that her decision was based entirely upon the interview.  Rather, Valentine has contradicted Reynolds' subjective description of his appearance and attitude at his interview.  He denies that he looked away from her, or that he only looked at her when he responded to a question, or that he was "not engaging" or "standoffish."  His description of his interview differs markedly from Reynolds' description.

An employer may rely upon subjective evaluation factors when making hiring decisions, and it is not the province of the Court to question the use of such factors.  See Browning v. Dept. of the Army, 436 F.3d 692, 698 (6th Cir. 2006).  But the Sixth Circuit has also cautioned that such

> ... subjective evaluation processes intended to recognize merit provide ready mechanisms for discrimination. ... [T]he legitimacy of the articulated reason for the employment decision is subject to particularly close scrutiny where the evaluation is subjective and the evaluators themselves are not members of the protected minority. ... The Supreme Court in Burdine[1] voiced similar concerns.  The Court stated the articulated reasons must be "clear and specific" to rebut the prima facie case and guarantee that the plaintiff will be afforded "a full and fair opportunity" to demonstrate pretext. ... Obviously the more subjective the qualification and the manner in which it is measured, the more difficult it will be for the defendant to meet the burden imposed by the court in Burdine.

Grano v. Dep't. of Dev., 699 F.2d 836, 837 (6th Cir. 1983)(internal citations omitted).   To challenge Remke's reliance on the subjective factors Reynolds articulated, Valentine has

---

[1] Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981).

come forward with a collection of circumstantial evidence that he contends raises a reasonable inference of discrimination. As was noted in Manzer, in appropriate cases the "... sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." Manzer v. Diamond Shamrock, 29 F.3d at 1084.

(1) Reynolds did not follow Wirth-Barnes' recommendation that Remke hire Valentine for the Highland Ridge store. That store is the only one for which Reynolds did **not** accept the current manager's recommendation to either hire or to not hire a current Bigg's pharmacy employee.

(2) As was noted above, Reynolds expressed a desire to ensure continuity in the Bigg's stores when the current teams were working well together and were successful in building customer relationships. Only three of the former Bigg's staff pharmacists were not hired by Remke. One (Hensley) was leaving the Cincinnati area; a second (Gildea) was not hired due to the negative recommendation of his pharmacy manager and of others. Valentine was the only other staff pharmacist not offered a position, despite Wirth-Barnes' strong recommendation, their good teamwork at the store, and her statement to Reynolds that she would be doing a "disservice to the community" by failing to hire Valentine.

(3) The pharmacist who replaced Valentine (David Orth) did not work for Bigg's, but worked for Remke in another store when Remke bought the Bigg's stores. Orth was the only non-Bigg's employee hired for a former Bigg's store, even though Reynolds admitted that Remke only accepted applications from current Bigg's employees to fill the positions at those stores.

(4) Reynolds discounted or ignored Valentine's significant prior experience and length of service, two important hiring criteria that were specifically listed as characteristics relevant to the job in Remke's written interview form.

(5) Valentine testified that before the interview started, Reynolds asked him "what would you say if I told you some people find you hard to get along with?" Accepting Valentine's testimony as true, as the Court must do at this point, Reynolds' comment raises an inference that she had received some negative information about Valentine, or that she had already decided not to hire him.

(6) Reynolds testified that she wanted two Remke employees to conduct each interview of the Bigg's interviewees; yet in only two instances did Reynolds adhere to that procedure. One of them was Valentine, the only African-American applicant.

(7) Reynolds testified that Valentine's incomplete job application and outdated resume reinforced her negative impressions of him. Wirth-Barnes testified that she did not bring a resume with her to her interview and did not even fill out an application. And Reynolds hired several individuals (Hunseder and Schlemmer) who did not fill out an application or provide any resume. Reynolds offered a job to Dan Kaiser although he did not fill out an application. And she hired a staff pharmacist who worked at a Kentucky Bigg's store that was being closed based on an application and resume that were five years out of date.

(8) Reynolds claimed that Valentine would be "difficult to manage" because he wanted to continue to do things his way, rather than Remke's and Reynolds' way. Reynolds' interview notes of another staff pharmacist, Todd McFarland, include her handwritten notes that McFarland "... seemed distracted and almost left the interview to

say hi to someone he knew." She also wrote that she was "unsure how he would take direction though - seems self-reliant but potential to go rogue? And do things the unapproved way." (Reynolds Dep. Ex. 4; emphasis in original) Despite these misgivings, however, Reynolds gave McFarland very high numerical ratings, and she offered him a position.

(9) Prior to Valentine's interview, he and Wirth-Barnes received inquiries about his position at the Highland store. While the source of information that may have prompted those calls is unknown, the fact that there were inquiries asking when Valentine would be leaving lend support to Valentine's description of the pre-interview "chatter" that he would not be hired by Remke's.

Remke offers arguments why this evidence is insufficient. For instance, Remke argues that Reynolds "honestly believed" that Valentine's body language was negative, that he slouched, and faced away from her during his interview, and that her honest belief in her observations is sufficient. If that were the case, an employer would be able to offer any subjective reason and claim that the employer "honestly believed" it to defeat a discrimination claim. Remke's explanation is the type of subjective evaluation that the Sixth Circuit addressed in Grano, when it held that an employer's reasons must be "clear and specific" so that the plaintiff has "a full and fair opportunity" to rebut them. Absent a video of the interview, the only way that Valentine could rebut such subjective assessments is to deny them.

Remke also argues that there was no formal requirement that Reynolds always follow pharmacy managers' recommendations, or keep the Bigg's pharmacy teams together. In the absence of such policies, Remke suggests that her decision not to

accept Wirth-Barnes' recommendation and to hire another pharmacist for the Highland Ridge store is not evidence of pretext. With respect to McFarland's interview, where Reynolds noted that he was distracted and might do things the "unapproved" way, Remke argues that McFarland received higher numerical ratings than Valentine on such characteristics as "people skills," "personality," and "initiative," thus distinguishing Reynolds' decision to hire McFarland. But Reynolds' decision not to adhere to her own stated preference about keeping effective working teams together, or to hire McFarland and not hire Valentine, was based entirely upon the same subjective factors she articulated to reject Valentine, and which Valentine has disputed.

Remke also attacks Valentine's assertion that Reynolds testified falsely in her deposition when she identified Goodwin and Wirth-Barnes as the only Bigg's employees she spoke to about Valentine. Valentine posed an interrogatory to Remke's, asking if any Supervalu employee or agent gave Remke "any information pertaining to" Valentine; Remke responded that Wirth-Barnes, Goodwin and Mark Landman verbally "provided information" to Reynolds. Reynolds was asked in deposition "how many people gave you opinions about Bob Valentine when you were contemplating [hiring] decisions." (Reynolds Dep at 72). Remke claims that Reynolds responded truthfully when she identified Goodwin and Wirth-Barnes as the only two who offered "opinions" and that Landman simply "provided information." Remke asserts that Valentine should have asked Reynolds what information Landman gave her, but failed to do so in her deposition. Setting aside the labels and accusations, the discrepancy between Reynolds' deposition answer and Remke's interrogatory response could be significant because Landman was the target of Valentine's EEOC charge, and had been transferred

out of the Highland Ridge after Valentine lodged complaints against him. While Remke suggests that the only reasonable inference concerning Reynolds' failure to discuss Landman in her deposition is that he did not provide an "opinion" about Valentine, it is not the only inference that arises from the fact that Landman had "provided information" to Reynolds about Valentine.

In Kimble v. Wasylyshyn, 439 Fed. Appx. 492 (6th Cir., September 28, 2011)(unpublished), the court reversed the district court's grant of summary judgment to the employer, concluding that the totality of plaintiff's circumstantial evidence, combined with his prima facie case, was sufficient to raise a genuine dispute on pretext. Plaintiff's evidence included the fact that the decision makers rejected his supervisor's unqualified recommendation to hire him; that an HR representative helped a Caucasian applicant with his application; and that he met all of the job's stated qualifications, while the chosen applicant did not at the time he applied. The Sixth Circuit found that the totality of plaintiff's evidence was sufficient to raise a strong suspicion of race-based preference.

The Court reaches a similar conclusion here. Although each item of Valentine's circumstantial evidence may not be sufficient by itself, the Court finds that the cumulative effect and totality of the circumstances presented here do raise an inference of discrimination. Valentine was the oldest and the only African-American applicant for a staff pharmacist position; he was not offered a position despite his admitted qualifications, extensive experience, and the strong recommendation of his pharmacy manager. He has pointed out a number of inconsistencies and conflicts in the witnesses' testimony that suggest that Remke's proffered reason for refusing to hire him was not the true reason. The Sixth Circuit has cautioned that at summary judgment stage, "...[i]f the

plaintiff has made out a prima facie case of discrimination, the defendant can be awarded summary judgment only if no reasonable jury could conclude that the reasons offered for [the decision] were only a pretext hiding a discriminatory motive." <u>Rowan v. Lockheed Martin Energy Sys</u>., 360 F.3d 544, 547-548 (6th Cir. 2004). The Court cannot conclude that based upon all of this evidence, no reasonable jury could find in Valentine's favor on his discrimination claims.

<u>Retaliation Claims</u>

Valentine also alleges that Remke's decision not to hire him was in retaliation for his prior complaints and EEOC claim against Bigg's, in violation of federal and state law. To make out a prima facie case of retaliation, Valentine must show: (1) he engaged in Title VII-protected activity; (2) Remke knew that he engaged in that activity; (3) Remke subsequently took an adverse employment action against him; and (4) the adverse action was causally connected to the protected activity. <u>Upshaw v. Ford Motor Co.</u>, 576 F.3d 576, 588 (6th Cir. 2009)(internal citations omitted). "The burden of proof at the prima facie stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the protected activity and the retaliatory action." <u>Id</u>.

Remke disputes both the second and the fourth prongs. Reynolds testified that she did not know about Valentine's prior complaints and EEOC claim; she knew he was involved with some "legal action" but did not know what the claim was about or that it involved any Title VII-protected activity. Goodwin testified that Reynolds told him she learned about the EEOC claim from McCann, the Supervalu supervisor. Remke responds that this is hearsay within hearsay, and cannot be considered under Rule 56.

Whatever McCann may have told Reynolds about the claim, Goodwin testified that Reynolds told him that she knew about Valentine's claim. Her knowledge as the sole decision-maker is what must be shown for the second prong of the prima facie case, and the conflicting testimony is sufficient to raise a reasonable inference of Reynolds' knowledge.

Remke also contends that Valentine has no evidence of any causal connection between Reynolds' knowledge and the decision not to hire him. Goodwin testified that Reynolds seemed "indifferent" to Valentine's previous claim, and that she mentioned it to Goodwin because she was concerned about Valentine's sensitivity if he was not offered a job. Remke also notes that Reynolds herself had filed an EEOC claim against a former employer, belying any inference that she would discriminate or retaliate against someone who had done the same thing. Valentine argues that Reynolds' decision not to hire him was made immediately after she learned about his EEOC claim and his prior complaints of discrimination. Temporal proximity may be sufficient to raise an inference of causation; see <u>Upshaw v. Ford Motor Co.</u>, 576 F.3d at 588-589. Valentine also cites Reynolds' decision to have another Remke employee with her for his interview, and Goodwin's testimony that Reynolds was concerned about not offering Valentine a job because of his prior claim. Moreover, Valentine testified that the first thing Reynolds asked him on the day of his interview was, "what would you say if I told you some people find you hard to get along with?" (Valentine Dep. at 70-71) While there are several inferences that might arise from this comment, one reasonable inference is that Reynolds had learned about and was concerned about Valentine's prior discrimination complaints against Mark Landman, someone that Remke admitted had spoken with

Reynolds about Valentine.

The Court finds that all of this evidence is sufficient to satisfy Valentine's prima facie burden on his retaliation claim. And for the same reasons discussed above with respect to his discrimination claims, the Court concludes that Valentine has established a genuine dispute about whether Remke's stated reasons for not hiring him were pretextual. The Court cannot find based on this record that no reasonable jury could find in Valentine's favor on his retaliation claims.

## CONCLUSION

For all of the foregoing reasons, the Court denies Defendant's motion for summary judgment (Doc. 25).

SO ORDERED.

DATED: September 13, 2012      s/Sandra S. Beckwith
                                               Sandra S. Beckwith
                                               Senior United States District Judge